DISTRICT OF COLUMBIA, Appellant,

v.

The CHESAPEAKE AND POTOMAC
TELEPHONE CO., Appellee.

No. 85–1288.

District of Columbia Court of Appeals.

Argued May 9, 1986.
Decided Oct. 15, 1986.

Lutz Alexander Prager, Asst. Corp. Counsel, with whom John H. Suda, Acting Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, were on the brief, for appellant.

Frederick B. Abramson, with whom Robert D. Lynd and Douglass J. McCollum were on the brief, for appellee.

Before NEBEKER and TERRY, Associate Judges, and GALLAGHER, Senior Judge.

NEBEKER, Associate Judge:

In this appeal the District of Columbia challenges the trial court's grant of summary judgment to the Chesapeake and Potomac Telephone Company (C & P). The District asserts that the trial court erred in concluding that the gross receipts C & P receives from various competitive long-distance telephone common carriers for providing exchange access to local customers are nontaxable because such gross receipts are not "from the sale of public utility commodities and services...." D.C.Code § 47–2507 (1986 Supp.). We affirm the ruling of the trial court.

I

This appeal presents an important question concerning C & P's tax liability for the access[1] charges that other long-distance carriers (OCC's) have paid to C & P in return for access to C & P's local telephone network.[2] The District of Columbia claims that C & P is liable for the tax in question because the access C & P provides OCC's results in the sale of a public utility com-

---

1. The term "access" is defined as "the use of certain (local) exchange plants necessary to originate and terminate interexchange (long-distance) services." *MTS & WATS Market Structure,* 93 F.C.C.2d 739 (1983).

2. The District of Columbia Department of Finance and Revenue assessed C & P $4,666,-124.76 for the months January through May 1984, and it is from this assessment that C & P appealed to the Tax Division. C & P paid this tax amount and thereafter, during the Tax Division litigation, C & P continued to pay the monthly tax on the gross receipts that are the subject of this appeal.

modity or service within the meaning of D.C.Code § 47–2501.[3] On the other hand, C & P argues that both prior case law and the Department of Finance and Revenue's own rulings preclude tax liability. Because we interpret the facts before us as falling within the rule of law established by the United States Court of Appeals for the District of Columbia Circuit in *Chesapeake and Potomac Telephone Co. v. District of Columbia,* 117 U.S.App.D.C. 21, 325 F.2d 217 (1963) (*C & P III*), we decide this case in appellee's favor. We hasten to note, however, that the significant structure changes in the telephone industry resulting from the divestiture of AT & T, *see United States v. American Telephone & Telegraph Co.,* 552 F.Supp. 131 (D.D.C. 1982), *aff'd mem.,* 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983), render the tax consequences of those changes appropriate for legislative consideration.

The case before us arises out of the divestiture of AT & T[4] and the relationship that now exists between AT & T, which exclusively provides long-distance telephone service, and C & P, which exclusively provides local telephone service. Prior to Phase 1 of the AT & T divestiture in January 1984, C & P, which was a subsidiary of AT & T, provided long-distance service to its customers located in the District of Columbia. Because all long-distance calls require the use of both local equipment and long-distance facilities, C & P provided this service through a partnership among the local telephone companies, like itself, that were subsidiaries of AT & T, the various other independent local telephone companies and AT & T. Long-distance calls placed by a C & P customer would originate in the District from the subscriber's local loop and then travel through local switches to long-distance lines. The calls would finally pass on the receiving end through local switches before entering the receiving subscriber's local loop. Revenues that AT & T received from interstate calls were allocated to each local telephone company in proportion to the use of its facilities; if the local company was an AT & T subsidiary, the revenue was shared through a process called division of revenues.

Under the division of revenue process that existed prior to divestiture, when a C & P customer placed a long-distance call in the District, C & P directly billed that customer. Upon receiving payment for such long-distance charges, C & P remitted that amount to an interstate "pool" from which AT & T allocated the respective shares to the local telephone companies. The revenues that C & P received under this process were subject to the gross receipts tax because C & P was providing long-distance service directly to its customers and it "was receiving revenue for a public utility

---

**3.** D.C.Code § 47–2501 (1986 Supp.) provides in pertinent part:

> On or before the 20th day of each calendar month, all gas, electric lighting and telephone companies, through their proper officers, shall file an affidavit with the Mayor, indicating the amount of its or their gross receipts for the preceding calendar month from the sale of public utility commodities and services within the District of Columbia....

*Id.* Section 47–2501 was first enacted in 1939 to tax gross receipts resulting from the provision of utility service without deductions for costs. District of Columbia Revenue Act of 1939, 53 Stat. 1107, ch. 367, title IV, § 2(a). The 1939 Act replaced an earlier tax on "gross earnings," District of Columbia Revenue Act of 1902, 32 Stat. 590, 619, ch. 1352, § 6, para. 5, which were computed as gross receipts less expenditures in *producing* the service or commodity. The 1939

Act was passed as a result of growing dissatisfaction shared by the utilities and taxing authorities alike, with the practice of taxing earnings from sales of services and supplies by District utilities to other utility companies. *Chesapeake & Potomac Telephone Co. v. District of Columbia,* 117 U.S.App.D.C. 21, 25, 325 F.2d 217, 221 (1963).

**4.** In *United States v. American Telephone & Telegraph Co., supra,* the district court divested AT & T of its local operating utilities and ordered the local utilities to provide network access services and facilities to the OCC's that are "equal in type, quality and price." *Id.* at 142. Of course, the OCC's are free to develop their own local facilities as a means of providing long-distance service instead of using the services and facilities that the established local utilities provide.

service which it had held itself out to render to the public...." *Chesapeake & Potomac Telephone Co. v. District of Columbia, supra,* 117 U.S.App.D.C. at 27, 325 F.2d at 232; *see Chesapeake & Potomac Telephone Co. v. District of Columbia,* 78 U.S.App.D.C. 53, 54, 137 F.2d 674 (1943) (*C & P I*) (concluding that gross receipts tax applies to receipts from handling interstate calls).

Apart from its own long-distance service, for many years C & P has provided network access services to numerous unaffiliated OCC's such as Western Union Telegraph Company, Radio Corporation of America, MCI Telecommunications, Inc., and GTE Sprint. These OCC's provide long-distance service to their own customers and are entirely separate from either AT & T or C & P. Whenever the customer of one such company places a long-distance call either from or into the District, C & P allowed the unaffiliated company to use C & P's services and facilities to serve their customers pursuant to agreement.[5] The unaffiliated OCC's bill their own customers and payments are remitted directly to the company. The OCC's in turn pay C & P for the use of C & P's network access services and local facilities that allow the OCC's to serve their customers.

Prior to 1984, C & P was never required to pay the gross receipts tax based on the revenues it received from the OCC's for their use of C & P's network access services and facilities. Although the District asserted in 1962 that the gross receipts tax applied to such revenue, the D.C. Tax Court ruled that such revenues "are not 'public utility commodities or services.' " *Chesapeake & Potomac Telephone Co. v. District of Columbia,* No. 1756, slip op. at 12 (D.C. Tax Court, July 17, 1962), *aff'd in part,* 117 U.S.App.D.C. 21, 325 F.2d 217 (1963). Since that time, C & P has consistently reported and treated as nontaxable those revenues received from OCC's for their use of C & P's network access services and facilities.[6]

After the AT & T divestiture of C & P on January 1, 1984, C & P ceased providing long-distance telephone service in the same manner as the OCC's. Like the other OCC's, AT & T can use C & P's network access services and local facilities or it can

---

5. When local utilities, like C & P, provide network access to OCC's for interstate calls, the provision of such access falls, in part, within the jurisdiction of the Federal Communications Commission. *See Smith v. Illinois,* 282 U.S. 133, 51 S.Ct. 65, 75 L.Ed. 255 (1930). In 1974, the FCC ordered AT & T and its subsidiaries to furnish all interconnection services needed to allow OCC's access to local exchange facilities under "charges ... specified in tariffs filed with the Commission." *Bell System Tariff Offering of Local Distribution Facilities for Use by Other Common Carriers,* 46 F.C.C.2d 413, 438–39, *aff'd sub nom., Bell Telephone Co. v. FCC,* 503 F.2d 1250 (3d Cir.1974), *cert. denied,* 422 U.S. 1026, 95 S.Ct. 2620, 45 L.Ed.2d 684 (1975); *see also MCI Telecommunications Corp. v. FCC,* 188 U.S. App.D.C. 327, 580 F.2d 590, *cert. denied,* 439 U.S. 980, 99 S.Ct. 566, 58 L.Ed.2d 651 (1978) (guaranteeing OCC's connections to local exchanges and local exchange customers). Thus, OCC's compensate the local utilities pursuant to a complex formula designed to make available adequate facilities at reasonable rates, to encourage network efficiency, and to eliminate unjust discrimination or unlawful preferential rates. *National Ass'n of Regulatory Utility Commissioners v. FCC,* 237 U.S.App.D.C. 390, 403, 737 F.2d 1095, 1108 (1984), *cert. denied,* 469 U.S. 1227, 105 S.Ct. 1224, 84 L.Ed.2d 364 (1985).

6. In 1978, C & P mistakenly reported the revenues received from the OCC's as taxable. C & P subsequently amended its return to eliminate such revenues from the gross receipts tax base. The District granted C & P a tax refund based on the amended return without the need of an audit.

In addition, the District conducted a tax audit of C & P in 1978. During the audit, C & P informed the District that it had excluded from its gross receipts tax base the revenues it received from unaffiliated OCC's for network access services and facilities that the carriers in turn resold to the public. The District's records reveal that it concluded the audit with "no discrepencies found" because the revenues in question "remained exempt." The District audit cited as authority for this exemption the ruling of the United States Court of Appeals for the District of Columbia Circuit in *Chesapeake & Potomac Telephone Co. v. District of Columbia, supra,* (*C & P III*), the case we find controlling here.

bypass C & P's facilities and develop its own local facilities if it chooses.

During the tax year in question, C & P reported the revenues it received from AT & T in the same manner as those received from other OCC's, *i.e.,* that such revenues were exempt from the gross receipts tax. In July 1984, the Department of Finance and Revenue assessed C & P the gross receipts tax on the revenues it had received from AT & T since divestiture for network access services and local facilities. C & P paid the tax and then filed suit in the Tax Division for a full refund. The Tax Division granted C & P's motion for summary judgment and ordered the District to refund the payments made. It is from the trial court's order that the District has appealed.

## II.

### A.

▮ Our review of the Tax Division's decisions is the same as in other civil cases that are tried without a jury. D.C.Code § 47–3304(a) (1981); *Hutchison Brothers Excavating Co., Inc. v. District of Columbia,* 511 A.2d 3, 6 (D.C.1986). As to conclusions of law, we will not overturn the trial court's holding unless it is erroneous. *Id.* (citing *Burns v. Hanover Insurance Co.,* 454 A.2d 325, 328 (D.C.1982)). We have the power to affirm, modify, or reverse a decision of the Tax Division with or without remanding the case for a hearing. D.C. Code § 47–3304 (1981); *District of Columbia v. Washington Sheraton Corp.,* 499 A.2d 109, 111 (1985).

### B.

▮ The Tax Division granted summary judgment to C & P, concluding that, as a matter of law, the network access revenues at issue are nontaxable because the services C & P provides other utility companies are not the public utility services contem-plated under § 47–2501. We agree with the Tax Division and affirm its order of refund.

In resolving this case, we are aided by several prior decisions of the United States Court of Appeals for the District of Columbia Circuit that delineate particular circumstances under which § 47–2501 applies.[7] In *Chesapeake and Potomac Telephone Co. v. District of Columbia, supra, (C & P I),* the U.S. Court of Appeals considered whether revenues derived from interstate telephone service would be included in C & P's gross receipts. The revenues C & P received were for interstate telephone service that it held itself out to the public as providing and that it provided directly to its subscribers. Moreover, C & P derived these revenues through the division of revenues process with AT & T, AT & T's affiliates, and other independent utilities. The court held that such revenues were clearly within the scope of the gross receipts tax. *Id.* at 54, 137 F.2d at 675.

In a second case, *District of Columbia v. Chesapeake and Potomac Telephone Co.,* 86 U.S.App.D.C. 124, 179 F.2d 814 (1950) (*C & P II*), the same court considered whether revenues derived from the sale of telephone directories and advertising space therein were includable in C & P's gross receipts. The court first decided that C & P's sale of advertising space was the sale of a public utility commodity or service, and thus revenue derived from such sale was includable as gross receipts for tax purposes. The court further concludes that revenue derived from C & P's sale of telephone directories to its customers was also includable as gross receipts.

In *Chesapeake and Potomac Telephone Co. v. District of Columbia, supra, (C & P III),* which is factually similar to the case before us, the court considered whether revenues C & P received from other communications carriers for use of C & P facilities by these carriers in serving their cus-

---

7. Under *M.A.P. v. Ryan,* 285 A.2d 310, 313 (D.C. 1971), all pre-February 1, 1971 decisions of the United States Court of Appeals for the District of Columbia "constitute the case law of the District of Columbia."

tomers were includable as gross receipts. In concluding that such revenues were not subject to the gross receipts tax, the court stated:

> when a public service company supplies services or facilities to another public utility company in the same field for the sole purpose of enabling the latter company to serve its customers more efficiently, such services are not "public utility commodities or services" within the meaning of our statute, and thus are not subject to the gross receipts tax.

*Id.* at 26, 325 F.2d at 222.

In deciding the case before us, we are persuaded, and indeed bound, by the *C & P III* holding. The distinctions between *C & P I* and *C & P III* are the same as the distinctions we perceive to exist, as did the Tax Division, between C & P's pre-divestiture liability for revenues received pursuant to the division of revenues process, and C & P's post-divestiture relationship to AT & T and the OCC's. In *C & P I,* the court decided that the revenues C & P received pursuant to the division of revenues process were includable as gross receipts because C & P received revenue for a service that it held itself out as providing to the public. On the other hand, in *C & P III,* the court concluded that revenues derived from services rendered to another utility "for the sole purpose of enabling the latter company to serve its customers more efficiently" were not includable as gross receipts.[8] Because the network access services and local facilities C & P currently provides the OCC's obviously enables them to serve their customers, the revenues C & P derives from such services and facilities are not includable as gross receipts.

Attempting to distinguish the facts before us from prior case law, the District propounds a three-part test that must be met before revenues may be excluded from gross receipts. The District argues that revenues are not includable as gross receipts only when C & P's service does not affect its District subscribers; does not grow out of C & P's exclusive franchise or dominant position in the District; and is not regulated. This argument is unavailing. Initially, such a three-part test has never been articulated in the controlling cases. Moreover, *C & P III,* which we conclude is controlling case law, does not support the District's argument because the revenues C & P derived in that case certainly resulted, in part, from C & P's dominant position in the District.

The District also asserts that the revenues at issue are includable as gross receipts because access charges are subject to tariffs regulated by the FCC. The District further points out that, although the revenues at issue were paid pursuant to contract between C & P and AT & T, the contract was controlled by existing Exchange Network Facilities for Interstate Access (ENFIA) rates. *See In the Matter of Exchange Network Facilities for Interstate Access* (ENFIA), 71 F.C.C.2d 440 (1979) (establishing formula for payment by OCC's for local network access). Thus, the District argues that although there was no *de facto* tariff, the relationship between C & P and AT & T was as closely regulated as if tariffs had been in effect. The District's argument is unpersuasive.

Initially, the District never treated the predivestiture revenues C & P received from the OCC's as gross receipts even though such revenues were subject to ENFIA controls. In fact, during the 1978 audit of C & P, the District explicitly treated these revenues as exempt from § 47–2501. In addition, the District ignores the court's holding in *C & P II,* which included revenues derived from nontariffed telephone directory advertising in the gross receipts tax.

We acknowledge that the case before us is difficult primarily because C & P is no longer subject to a tax on the same gross

---

**8.** It is important to note that the OCC's are free to use C & P's local network services and facilities or to by-pass C & P's facilities, construct their own facilities, and connect directly to their local customers.

receipts that it was subject to in the predivestiture era pursuant to the division of revenue process. Nevertheless, we are not at liberty to disregard controlling precedent.[9] Thus, we conclude that the revenues at issue here are not includable as gross receipts because the network access services and local facilities were provided to enable long-distance carriers to serve their customers more efficiently. Accordingly, the order on appeal herein is

*Affirmed.*

---

9. The District argues that its failure to demand payment of the gross receipts tax on access charges prior to 1984 should not prevent it from collecting the tax now. Although we acknowledge that agency inaction warrants little deference, *Hutchison Brothers Excavating Co., Inc. v. District of Columbia, supra; see Baltimore & Ohio Railway Co. v. Jackson,* 353 U.S. 325, 330–31, 77 S.Ct. 842, 845–46, 1 L.Ed.2d 862 (1957), we are not here confronted with the Department of Finance and Revenue's failure to collect a tax that it is authorized to collect pursuant to statutory authority. Rather, the Department of Finance and Revenue neither previously nor currently possesses the authority to apply § 47–2501 to revenues derived from network access charges.